SANDRA R. BROWN
Acting United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK (CBN 149883)
Assistant United States Attorney
Chief, Asset Forfeiture Section
   312 North Spring Street, 14th Floor
   Los Angeles, California 90012
   Telephone: (213) 894-6166
   Facsimile: (213) 894-7177
   E-mail: Steven.Welk@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> REAL PROPERTY LOCATED AT 2323 MAIN STREET, IRVINE, CALIFORNIA, <br><br> Defendant. | NO. 8:17-CV-1592 <br><br> VERIFIED COMPLAINT FOR FORFEITURE *IN REM* <br><br> [19 U.S.C. § 1595a(a)] <br><br> [H.S.I.] |

     The United States of America brings this complaint against the above-captioned asset, described more particularly below, and alleges as follows:

## JURISDICTION AND VENUE

    1.    This is a civil forfeiture action brought pursuant to 19 U.S.C. § 1595a(a).

1

2.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

3.  Venue lies in this district pursuant to 28 U.S.C. § 1395(b).

## PERSONS AND ENTITIES

4.  The plaintiff is the United States of America.

5.  The defendant is Real Property Located at 2323 Main Street, Irvine, California, (hereinafter, the "Irvine Warehouse" or "defendant real property"). The legal description of the defendant real property is set out in in Attachment A.

6.  As of September 11, 2017, the Irvine Warehouse is titled in the name of Von Karman – Main Street, LLC, a Delaware limited liability company. Plaintiff is unaware of any other persons or entities with an interest in the defendant real property.

7.  *Zhongtian Liu*

   a.  Zhongtian Liu, a Chinese national, is the founder and chairman of China Zhongwang, one of the world's largest industrial aluminum extrusion companies. Zhongtian Liu controls and is effectively the owner of Perfectus Aluminum, Inc. ("Perfectus").[1]

   b.  Between 2011 and at least 2014, Zhongtian Liu used Perfectus to illegally import more than 2.1 million aluminum "pallets" from China into the United States, as described in detail below.[2] The "pallets" were manufactured by

---

[1] As detailed below, in paragraph 11(b), in 2014 seven separate entities merged to form Perfectus. In this Complaint, unless otherwise specified, all references to "Perfectus" include Perfectus Aluminum, Inc. and the seven predecessor entities.

[2] The word "pallets" appears in quotes when the reference applies to aluminum extrusions cut-to-length and welded together in the shape of pallets. These "pallets" were not marketable or suitable for use as pallets. Rather, they were manufactured as a ruse to avoid paying Customs duties upon importation into the United States.

1  China Zhongwang and/or its affiliates and "sold" to Perfectus by several
2  intermediary entities, including Dalian Liwang Trade Co., Ltd., Zhongwang
3  Investment Group, and Yingkou Quianxiang Trading.  Many of these intermediary
4  entities are or were owned and operated during the relevant period by members of
5  Zhongtian Liu's family or his close associates.

        8.    *Zhijie "Jasmine" Wang*

            a.    Zhijie "Jasmine" Wang ("Wang") is believed to be Zhongtian Liu's wife and is the mother of Zuopeng Liu.  Although immigration records reflect that Wang divorced Zhongtian Liu in 1999, the government alleges on information and belief that Wang and Zhongtian Liu are presently married, and that Wang is still commonly referred to by others as "Mrs. Liu."

            b.    California public records reflect that Wang is the agent for Alston International, Inc., and Alston International Investment Group, Inc. (collectively, the "Alston Entities," described more particularly below), and the following LLCs that hold title to the following real properties where Perfectus harbored and concealed aluminum products, including the bogus "pallets":

        i.    1001 South Doubleday Ave., Ontario, CA (the "Ontario Warehouse"), titled in the name of 1001 Doubleday LLC;

        ii.    10681 Production Avenue, Fontana, CA ( the "Fontana Warehouse"), titled in the name of 10681 Production Avenue LLC;

        iii.    2323 Main Street, Irvine, CA (the "Irvine Warehouse"), titled in the name of Von Karman – Main Street LLC; and

        iv.    14600 Innovation Drive, Riverside, CA (the "Riverside Warehouse"), titled in the name of Scuderia Development LLC.

c. Wang is an authorized signer for at least three separate Perfectus accounts, including Perfectus's payroll account.

9. *Zuopeng Liu*

a. Zuopeng Liu is the son of Zhongtian Liu and Wang, and has a son named "Alston," for whom the Alston Entities (discussed below) are believed to have been named.

b. Zuopeng Liu incorporated Perfectus in 2014.

c. Just prior to the merger of Perfectus's predecessor entities (described in paragraph 11(b), below) in 2014, Zuopeng Liu was listed as an officer for each of the predecessor entities with the California Secretary of State.

d. Zuopeng Liu was, for a period in 2014 or 2015, in charge of an entity called Aluminum Shapes, LLC, a privately held company in Delair, New Jersey, registered with the New Jersey Secretary of State ("Aluminum Shapes").

10. *Xiang Chun "Johnson" Shao*

a. Johnson Shao ("Shao") is a naturalized United States citizen originally from China.

b. From 2004 to 2014, Shao was the principal and manager of Pengcheng Aluminum Enterprise, Inc. ("Pengcheng"). In 2010, Shao testified before the United States International Trade Commission ("USITC") and was introduced by Pengcheng's general counsel, Charles Pok ("Pok"), as Pengcheng's president.

c. At various times between 2008 and 2014, Shao was the listed officer/agent for each of Perfectus's seven predecessor entities.

d. Shao is believed to have left Perfectus in late 2014 or in 2015. However, Shao stated in a declaration filed in this Court (the "Shao Declaration") that he was appointed "manager" of Perfectus in 2016, and oversaw Perfectus's

"export program."[3] The export program was an attempt to remove from the United States the millions of "pallets" illegally imported into the United States as part of the conspiracy alleged herein. The purpose of the conspiracy was to avoid antidumping and countervailing duties ("AD/CVD") imposed by the United States Department of Commerce (the "Commerce Department") on certain types of Chinese aluminum, including Series 6 aluminum.

11. *Perfectus Aluminum, Inc.*

a. Perfectus was incorporated in California in December 2014 by Zuopeng Liu. At the time of incorporation, Perfectus's corporate address was the Ontario Warehouse, and its Chief Executive Officer was Zuopeng Liu.

b. In 2014, several entities (all co-located at the Ontario Warehouse) merged into Perfectus, including: Pengcheng; Transport Aluminum, Inc.; Century American Aluminum, Inc.; American Apex Aluminum, Inc.; Global Aluminum (USA), Inc. ("Global"); Aluminum Source, Inc.; and Aluminum Industrial, Inc. (collectively, the "predecessor entities").

c. Until approximately 2011, the main business of the predecessor entities was importing aluminum extrusions, that is, aluminum objects such as bars, tubes, or other parts. Beginning in 2011 and continuing through 2014, however, the predecessor entities (mainly Pengcheng) largely stopped importing aluminum extrusions and instead began importing mass quantities of what were purported to be aluminum pallets into the United States from China. In total, the predecessor entities imported approximately 2,190,000 aluminum "pallets" into the United States from China during this period in an effort to avoid AD/CVD.

12. *The Alston Entities*

a. Wang formed Alston International, Inc. in late 2013, and Alston International Investment Group, Inc. in early 2014.

---

[3] *Perfectus Aluminum, Inc. v. Sanchez, et al.*, EDCV 16-2640 DMG (SPx), Docket No. 10-1.

    b. An entity called "Alston Asset Management," located at the Irvine Warehouse, paid taxes in 2015 and 2016 for the four warehouses described in paragraph 8(b), above.

    c. California employment records reflect that Zhongtian Liu was employed by Alston International Inc. from 2014 to 2017.

  13. *Aluminum Shapes, LLC*

    a. Aluminum Shapes is a privately held New Jersey company.

    b. In or about December 2012, Shao, on behalf of Global, purchased Aluminum Shapes.

    c. As of 2015, Aluminum Shapes was owned by Jacky Cheung ("Cheung"). Cheung has also served as Perfectus's Chief Executive Officer and registered agent since at least January 2017.

    d. Plaintiff alleges on information and belief that Aluminum Shapes was purchased, at least in part, for the purpose of melting Zhongtian Liu's and Perfectus's stockpile of bogus aluminum "pallets" into aluminum billet, for sale in the United States.

FACTS SUPPORTING FORFEITURE

**Customs Framework and Antidumping
and Countervailing Duties Orders**

  14. The Harmonized Tariff Schedule of the United States ("HTS") is the primary source for determining tariff classifications on goods imported into the United States. The HTS lists thousands of classification codes from which Customs brokers, acting as an importer's agent, must choose, and each unique code informs United States Customs and Border Protection ("CBP"), the government agency charged with monitoring the entry of goods into the United States, of the correct duty or penalty that applies to a particular imported good.

  15. A company importing goods into the United States is required to complete a CBP Form 7501, also known as an Entry Summary. This is typically

done through a Customs broker acting as the company's agent.  The Form 7501 includes, among other things, the importer of record, country of origin, description of imported goods, and HTS classification codes for the imported goods.

16.     The USITC and the Commerce Department are responsible for conducting AD/CVD investigations.  "Dumping" is the practice of importing goods into the United States and selling those goods at less than fair value.  "Countervailing duties" are duties imposed on imported goods that have been subsidized by the exporting country.

17.     If an AD/CVD duty investigation reveals that a U.S. industry is being injured or threatened by dumping, the Commerce Department may issue AD/CVD orders to level the playing field for U.S. firms.

18.     In April 2010, the USITC and Commerce Department initiated AD/CVD investigations of imports of aluminum extrusions from the People's Republic of China.  The investigations determined that aluminum extrusions from China materially injured the U.S. domestic aluminum industry.  As a result, the Commerce Department issued two AD/CVD Orders on May 26, 2011.[4]  The order imposed import duties of up to 400% on certain aluminum extrusions, including extrusions made of Series 6 aluminum imported from China.[5]

---

[4] These AD/CVD Orders followed several preliminary determinations by the USITC and Commerce Department throughout 2010 and 2011.

[5] The AD/CVD Orders, consisting of AD case number A-570-967 and CVD case number C-570-968, were issued following a Commerce Department finding that Chinese producers/exporters were able to sell extruded aluminum for less than fair market value, and that the Chinese government was unfairly subsidizing Chinese producers/exporters of aluminum extrusions.  These duties apply to specific types of extruded aluminum made from certain aluminum alloys.  The Zhongwang Group was specifically targeted for enhanced duties of 374.15% in the countervailing duties order.

19. In June 2017, the Commerce Department issued a scope ruling in which it determined that certain aluminum extrusions from China made of Series 6 aluminum alloy, cut-to-length and welded together in the form of pallets, fell within the scope of the AD/CVD Orders. In reaching this determination, the Commerce Department rejected arguments that such pallets were "finished merchandise" and therefore outside the scope of the AD/CVD Orders. The "pallets" described in this complaint fall within this scope ruling.

20. The government's claims herein arise from a conspiracy amongst the persons and entities described above, and others, to evade the duties imposed by the AD/CVD Orders by disguising Series 6 aluminum extrusions as aluminum pallets or "finished products." Specifically, the defendant real property was involved in a conspiracy to (1) unlawfully import aluminum into the United States, in violation of Title 18, United States Code, Sections 542 (entry of goods by means of false statement), 545 (smuggling goods into the United States), and 371 (conspiracy); and (2) export aluminum from the United States, in violation of Title 13, United States Code, Section 305 (unlawful export information activities) and Title 18, United States Code, Section 371. The defendant real property is subject to forfeiture pursuant to 19 U.S.C. § 1595a(a) because it was used to aid in or facilitate the commission of these violations in that it was used to conceal and harbor the bogus aluminum "pallets" that were illegally entered into the United States.

**The Scheme to Defraud**

21. As noted above, prior to the issuance of the AD/CVD Orders in May 2011, the predecessor entities had been in the business of importing aluminum extrusions into the United States from China. Following the issuance of the AD/CVD Orders, Zhongtian Liu sought to find a way to continue to import aluminum extrusions into the U.S. while avoiding the substantial duties imposed as a result of the Orders. The conspirators ultimately decided to continue importing

aluminum extrusions into the U.S. and evade the AD/CVD by disguising the extrusions as aluminum pallets. These "pallets" were largely tack-welded (or spot-welded), heavy, and made of expensive aluminum, making them impractical for real-world use and too expensive to be sold for use as pallets.

22. Shao, acting on behalf of Pengcheng, was aware that the extrusions Perfectus had been importing prior to the AD/CVD Orders would fall within the scope of the Orders. In or about June 2011, Shao, knowing that his representation was false, advised a Customs broker who had worked with Perfectus since 2009 that, going forward, Perfectus's imports would consist of aluminum pallets that should be considered "finished product" within the meaning of the HTS, putting them outside the scope of the AD/CVD Orders. The broker relied upon Shao's false representation and completed the Customs paperwork accordingly, resulting in the submission of materially false Customs forms that prevented the collection of proper duties on the imported aluminum "pallets." Specifically, the broker designated "pallet" imports as "01" on the Form 7501, rather than "03," which would have triggered the AD/CVD.[6]

23. Between November 2011 and February 2012, another Perfectus employee communicated by email with the Customs broker, who asked whether Pengcheng's imports were "antidumping regulated." The employee falsely advised the Customs broker that the imports, including some of the "pallets," were not subject to the duties, causing the broker to continue to submit false entry documents to CBP. However, the "pallets" imported by Perfectus were not pallets, but merely Series 6 extrusions cut-to-size and welded together in the shape of pallets.

---

[6] The CBP Form 7501 Instructions (Updated July 24, 2012) indicate that for "Block 2) Entry Type," the code "01" represents an entry that is "free and dutiable," while code "03" represents an item subject to "Antidumping/Countervailing Duty (AD/CVD)." The "pallets" were imported using the code "01."

24. The submission of materially false Customs forms continued throughout the period between the issuance of the AD/CVD Orders and at least 2014, during which time Perfectus and its co-conspirators, with knowledge and understanding of the AD/CVD Orders, illegally imported approximately 2.1 million of these bogus aluminum "pallets," mischaracterizing them on U.S. Customs forms as not being subject to the Orders.

25. Plaintiff estimates that Perfectus avoided payment of more than $1.5 billion in tariffs by passing off these aluminum extrusions as finished products.

26. Perfectus had no intention of using or selling the "pallets," which were too heavy and otherwise unsuitable for use as pallets. Instead, the illegally-imported "pallets" were stockpiled by the conspirators in, at least, the four Warehouses. The conspirators planned to melt the "pallets" into aluminum billet, which would then be sold in the U.S. market, precisely the conduct the AD/CVD Orders were intended to prevent. Plaintiff alleges on information and belief that Zhongtian Liu, acting through others, also attempted to develop a new facility in Barstow, California that could be used to melt the "pallets."

27. At no time during the relevant period of importation or beyond were there existing customers for the "pallets," and the "pallets" were not suitable to be sold in the existing aluminum pallet market. After some early, unsuccessful efforts by sales representatives employed by Perfectus or its related entities to market the "pallets," the employees were instructed to discontinue any efforts to sell them. Indeed, as set forth in paragraph 48 below, Perfectus has admitted that none of its aluminum "pallets" were ever sold or leased in the United States.

**Perfectus Conceals and Harbors the Bogus Aluminum "Pallets" at the Irvine, Ontario, Fontana and Riverside Warehouses**

28. The illegally-imported "pallets" were delivered to the Irvine, Fontana and Ontario Warehouses, and stockpiled there until the warehouses reached full

capacity. Some of the illegally-imported "pallets" from the Irvine, Fontana and Ontario Warehouses were subsequently transferred to and stored at the Riverside Warehouse.

29. Fire Inspector Maurice Moore of the Fontana Fire Authority conducted multiple inspections of the Fontana Warehouse, beginning in 2013. During a routine fire inspection in 2015, Inspector Moore began seeing aluminum "pallets" stored at the premises. By late 2015, so many "pallets" were being stored in the exterior area of the property that a citation was issued for blocking emergency vehicle access.

30. In April 2016, Inspector Moore issued a citation at the Fontana Warehouse because of the height of the stacked aluminum "pallets." He noted during this time period that the warehouse was filled to capacity with "pallets" and other aluminum products. Plaintiff alleges that the "pallets" in the Fontana Warehouse were a portion of the illegally-imported "pallets" imported by Perfectus. When Inspector Moore returned to inspect the Fontana Warehouse property in January 2017, he discovered it was empty. He was advised by personnel working at the location that the "pallets" had been removed in late summer 2016 and sent to Vietnam.

31. During November and December of 2016, Perfectus moved more than 6.5 million pounds of "pallets" to the Riverside Warehouse from the Fontana and Ontario Warehouses. A total of 186 shipping containers of "pallets" were moved from Fontana, and 253 were moved from Ontario. Plaintiff alleges that the "pallets" moved from the Ontario and Fontana Warehouses to the Riverside Warehouse were a portion of the "pallets" illegally imported by Perfectus.

32. On February 2, 2017, Assistant Fire Marshal Bryan Healey of the Orange County Fire Authority ("OCFA") conducted an inspection at the Irvine Warehouse. Healey spoke with Howard Chen ("Chen"), who identified himself as the office manager of the Irvine warehouse, and stated that he had been employed

11

by Alston for approximately four years.  Chen further advised Healey that Alston was the accounting firm for Chen's "boss's investments."

33.     Healey observed both the (Alston) front office area and the storage area of the Irvine Warehouse during his inspection.  Healey estimated that approximately 80-90% of the Irvine Warehouse was filled with aluminum "pallets" stacked approximately 16 feet high.  The rest of the warehouse contained aluminum bars and tubes.  When asked about the "pallets," Chen told Healey that they were already at the warehouse when he started working for the company, and that his boss was storing the "pallets" "for somebody."  Plaintiff alleges that the "pallets" in the Irvine Warehouse were a portion of the illegally-imported "pallets."

**Perfectus Attempts to Export the Bogus Aluminum "Pallets"**

34.     The plan to melt down the "pallets" into billet and sell it in the U.S. market was frustrated when, among other things, an entity called Dupré Analytics published a report in 2015 (the "Dupré Report"), in which it alleged that Zhongtian Liu and China Zhongwang, together with others, were engaged in market fraud both in China and the United States.  The publication of the Dupré report and the ensuing publicity caused Zhongtian Liu to abandon his plan to melt down the imported aluminum pallets in the United States.  Thereafter, Zhongtian Liu, by and through Perfectus, began exporting Perfectus's U.S. stockpile of illegally-entered, bogus aluminum "pallets" to Vietnam, having decided to melt down the "pallets" in Vietnam and reintroduce the aluminum into the U.S. market as Vietnamese aluminum, which would not be subject to the AD/CVD Orders.  As part of this plan, Perfectus would eventually export 6,337 containers of bogus "pallets" out of the U.S. during 2016.

35.     In May 2016, Perfectus hired a freight forwarding company, Leader International Express, for an export project that included moving the illegally-entered "pallets" to the Port of Los Angeles/Long Beach (the "Port").  Shao was

the freight forwarding company's point of contact. As Perfectus's freight forwarder, Leader was responsible for filing paperwork with Customs indicating the type and nature of the products being exported. Plaintiff alleges on information and belief that Shao directed Leader to use the terms "aluminum extrusions" and "alloyed aluminum extrusions" for the export documents filed with Customs.

36. On or about September 14, 2016, the government received a tip that the Irvine Warehouse was being emptied of "pallets." According to the tip, trucks with sea containers that appeared to be loaded with aluminum pallets were moving the "pallets" to a different location.

37. Subsequently, agents conducted surveillance at the Irvine Warehouse and saw trucks lined up there. From their position, the agents could see into the Warehouse, whose bay doors were open, and they saw aluminum products stored inside.

38. Over the next two to three days, agents learned that Perfectus or its agents had hired trucks for approximately one week to move shipping containers from the Irvine Warehouse to the Port.

39. According to shipper export declarations ("SEDs") submitted to CBP by Leader, 580 containers delivered to the Port by or at the request of Perfectus contained "Alloyed Aluminum Extrusions" destined for Vietnam.

40. On or about September 19, 2016, agents and CBP officers conducted a cargo inspection of approximately 22 of the Perfectus containers delivered to the Port. The inspection disclosed that seven of the 22 containers contained aluminum extrusions or other aluminum parts, but the remaining 15 contained aluminum extrusions disguised as "pallets." Had the "pallets" been authentic pallets, and not aluminum extrusions disguised as pallets, the 15 containers would have been falsely manifested as "extrusions" on the Customs export paperwork.

41. Suspecting that these "pallets" were connected to the scheme described above, agents took additional investigative steps, including requesting

that a CBP laboratory test the chemical composition of one of the "pallets." The purpose of the laboratory tests was to determine whether the type of aluminum used to create the "pallets" was one of the types of aluminum subject to the AD/CVD Orders. The remaining Perfectus containers were detained pending further investigation.

42. A few weeks later, a CBP laboratory determined that the sample aluminum "pallet" removed from one of the Perfectus containers was made of Series 6 aluminum, making it subject to the AD/CVD Orders because the "pallet" was simply a collection of aluminum extrusions assembled in the shape of a pallet, and was not in fact a "finished product." The "pallet" tested weighed about 170 pounds (as compared to an authentic aluminum pallet, which would weigh about 50 pounds) and was spot-welded. The test "pallet" did not appear to be designed for industrial use.

43. In September 2016, CBP identified approximately 140 additional containers at the Port that were scheduled for export by Perfectus, bringing the total number of containers that Perfectus planned to export to 720.

44. In November and December 2016, the government completed a visual inspection of all of the shipping containers detained at the port.

45. On January 9, 2017, the government formally seized 549 of Perfectus's shipping containers at the Port (of the 720 delivered to the Port by Perfectus – the remainder were released), after having made an initial determination that the contents of the seized containers had been falsely entered into the United States as 01 Consumption entries with the intent to circumvent AD/CVD. The documents relating to those containers disclosed that their contents were entered between April and September of 2012. The containers contained approximately 130,000 bogus aluminum "pallets" that had been illegally imported into the U.S. as part of the scheme described herein.

46. The government subsequently expanded its investigation to determine whether and when Perfectus (or its predecessor entities) imported other aluminum "pallets," ultimately finding that Perfectus or its predecessor entities imported approximately 2,190,000 bogus aluminum "pallets" into the United States between 2011 and at least 2014.

47. The investigation further revealed that following importation, the bogus "pallets" were stored at the Ontario, Fontana, Irvine and Riverside Warehouses, and possibly others.

48. In the Shao Declaration, he stated that "Perfectus is in the business of purchasing and distributing aluminum products, and conducts its operations out of its headquarters located in Ontario, California." Shao admitted that Perfectus's "predecessor entities" had "imported aluminum pallets into the United States between 2012 and 2014" and that "none of the pallets were sold or leased here." He stated that the government had detained 547 containers of aluminum pallets and five containers of alloyed aluminum profiles, and that the value of those goods was approximately $25 million.[7] Shao further stated that Perfectus had since made a business decision to export the pallets to Vietnam.

49. On June 30, 2017, agents interviewed representatives of UNIS, a third-party storage company, who advised that the aluminum products previously stored in Perfectus's Irvine and Riverside Warehouses, including tens of thousands of the imported "pallets," had been moved to three separate UNIS facilities, located at 218 Machlin Court, Walnut, CA (the "Walnut location"); 15830 E.

---

[7] Shao admitted that, prior to the September 2016 detention of containers at the Port, Perfectus had exported 6,337 containers of "pallets" in 2016. Based on Shao's valuation of the contents of the detained containers, the prior exports represented hundreds of millions of dollars worth of aluminum.

1  Valley Blvd., City of Industry, CA (the "Industry (Valley) location"); and 900
2  Turnbull Canyon Road, City of Industry, CA. (the "Industry (Turnbull) location").[8]

3  50.  The transfer of the bogus "pallets" and other aluminum products from the Perfectus Warehouses to the UNIS locations began in May 2017, and continued to June 2017.[9]

6  51.  UNIS's point of contact for Perfectus was Shao.

7  52.  Agents examined the Perfectus products stored at all three UNIS locations, and observed large quantities of aluminum "pallets" stacked in the exterior lot of all three locations.

## CLAIM FOR RELIEF

53.  Based on the facts set out above, plaintiff alleges that the "pallets" seized in January 2017 at the Port and those stored at the three UNIS locations represent a portion of the more than 2.1 million bogus "pallets" imported by Perfectus and its predecessor entities between 2011 and 2014.  Plaintiff further alleges that all of said "pallets," as well as the "pallets" that were stored at the Warehouses before being exported to Vietnam or elsewhere, constitute property involved in a conspiracy to violate Title 18, United States Code, Sections 542 (entry of goods by means of false statement) and 545 (smuggling goods into the United States), and Title 13, United States Code, Section 305 (unlawful export information activities).  Plaintiff further alleges that each of the Irvine, Ontario, Fontana and Riverside Warehouses was used to conceal and harbor the illegally-entered "pallets," rendering the Warehouses subject to forfeiture to the United States pursuant to 19 U.S.C. § 1595a(a).

/ / /

---

[8] This was corroborated through surveillance of the Irvine and Riverside Warehouses where agents saw trucks moving aluminum products from those warehouses to the UNIS locations.

[9] By June 2017, the Ontario and Fontana warehouses had been emptied.

1     WHEREFORE, plaintiff United States of America prays that:

2     (a)    due process issue to enforce the forfeiture of the defendant real property;

4     (b)    due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

6     (c)    this Court decree forfeiture of the defendant real property to the United States of America for disposition according to law; and

8     (d)    this Court order such other and further relief as the Court may deem just and proper, together with the costs and disbursements of this action.

DATED: September 14, 2017     SANDRA R. BROWN
Acting United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

       /s/ Steven R. Welk
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## VERIFICATION

I, Jay Huang, hereby declare that:

1. I am a Special Agent with the U.S. Department of Homeland Security, United States Immigration and Customs Enforcement, Homeland Security Investigations and am the case agent for the forfeiture matter entitled *United States of America v. Real Property Located at 2323 Main Street, Irvine, California.*

2. I have read the above Verified Complaint for Forfeiture *In Rem* and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3. Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed September 13, 2017 in LOS ANGELES, California.

_____
JAY HUANG

# ATTACHMENT A

The land referred to herein is situated in the State of California, County of Orange, and is more particularly described as follows:

PARCEL 1, AS SHOWN ON A MAP FILED IN BOOK 107, PAGES 34 AND 35 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF ORANGE COUNTY, CALIFORNIA.

EXCEPTING THEREFROM THAT PORTION DESCRIBED IN DEED TO THE CITY OF IRVINE RECORDED AUGUST 9, 1993 AS INSTRUMENT NO. 93-0531590 OF OFFICIAL RECORDS OF SAID ORANGE COUNTY.

ALSO EXCEPTING ALL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL GAS RIGHTS AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN, THAT MAY BE BELOW THE UPPER 500 FEET OF THE SUBSURFACE OF SAID LAND, TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, MINING, EXPLORING AND OPERATING THEREFOR AND STORING IN AND REMOVING THE SAME FROM SAID LAND OR ANY OTHER LAND, INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL AND MINE FROM LANDS OTHER THAN THOSE HEREINABOVE DESCRIBED, OIL OR GAS WELLS, TUNNELS AND SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE LAND HEREINABOVE DESCRIBED, AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF, AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES WITHOUT, HOWEVER, THE RIGHT TO DRILL, MINE, STORE, EXPLORE OR OPERATE THROUGH THE SURFACE OR THE UPPER 500 FEET OF THE SUBSURFACE OF THE LAND HEREINABOVE DESCRIBED, AS RESERVED BY THE IRVINE INDUSTRIAL COMPLEX, A CORPORATION IN DEED RECORDED SEPTEMBER 8, 1972 IN BOOK 10316, PAGES 103 AND 108 OF OFFICIAL RECORDS.

TAX ID: 435-151-61